OPINION
On September 3, 1998, a motor vehicle operated by Maria E. Dalton collided with a motor vehicle negligently driven by Carmel A. Wilson. Ms. Wilson was insured under an automobile insurance policy issued by State Farm Mutual Automobile Insurance Company with liability coverage of one hundred thousand dollars per person. At the time of the accident, Mrs. Dalton was employed by Parker Hannifin Corporation ("Parker"), but was neither driving a company vehicle nor acting within the scope of her employment.
On August 18, 2000, Mrs. Dalton and her husband, Giles Dalton ("plaintiffs"), filed a complaint seeking compensatory damages from Ms. Wilson for personal injuries sustained by Mrs. Dalton in the collision.[1] In addition, plaintiffs sought a declaratory judgment that they qualified as insureds and were entitled to uninsured/underinsured motorist ("UM/UIM") coverage under three separate policies issued to Parker: (1) a business automobile liability policy issued by Zurich Insurance Company ("Zurich"); (2) a commercial general liability policy issued by Acadia International Insurance Limited ("Acadia"); and (3) a commercial umbrella liability policy issued by Steadfast Insurance Company ("Steadfast"). The Parker Hannifin Health Plan and Provident Life Accident Insurance Company ("Provident") were also named as defendants with respect to subrogation/reimbursement rights arising for benefits paid to plaintiffs under the terms of those plans/policies. Plaintiffs also sought a declaratory judgment that they were insureds and entitled to UM/UIM coverage under their automobile liability policy with State Farm Automobile Insurance Company ("State Farm Auto") and their homeowner's policy with State Farm Fire and Casualty Company ("State Farm Fire").
The insurance carriers all denied that their respective policies provided UM/UIM coverage. In addition, Zurich, Acadia and Steadfast each filed counterclaims seeking a declaration that their policies did not provide UM/UIM coverage for plaintiffs' damages. Zurich filed an amended answer asserting the additional affirmative defense that Parker is self-insured and therefore its policy was not subject to the requirements of R.C. 3937.18.
Although plaintiffs did not name Parker as a defendant, Parker, with leave of court, intervened as a new-party defendant to assert its defense of self-insurer. Plaintiffs filed separate motions for summary judgment against Parker, Zurich, Acadia and Steadfast,[2] who in turn filed a joint motion for summary judgment against plaintiffs. On August 29, 2001, the trial court granted summary judgment in favor of defendants and denied plaintiffs' motions for summary judgment. Specifically, the trial court found that pursuant to "matching deductible" language contained in the Zurich and Acadia policies, Parker was self-insured "in a practical sense" and, accordingly, Parker's policies with Zurich and Acadia were not subject to the mandatory requirements of R.C. 3937.18. Further, the trial court determined that even if Parker was not self-insured, Parker had validly rejected UM/UIM coverage. In addition, the trial court found that since there was no UM/UIM coverage imposed under the Zurich policy, the excess coverage provided by the Steadfast policy was never triggered.
On August 31, 2001, the trial court filed an "Agreed Journal Entry," in which the parties stipulated, inter alia, that plaintiffs sustained total damages of two hundred fifty thousand dollars as a proximate result of the motor vehicle collision; that the potential UM/UIM coverage available to plaintiffs was reduced by Ms. Wilson's available bodily injury liability insurance coverage of one hundred thousand dollars; that plaintiffs' claims against Ms. Wilson and State Farm Auto were dismissed with prejudice; and that plaintiffs' claims against State Farm Fire and Provident were dismissed without prejudice.
Plaintiffs have timely appealed the trial court's judgment, advancing three assignments of error for our review:
 [1.] The trial court erred in granting summary judgment in favor of defendant-appellees, Zurich Insurance Company and Parker Hannifin Corporation, and denying plaintiff-appellants' motion for summary judgment on their claim for declaratory relief on Zurich Business Auto Policy Number BAP 8416950-01.
 [2.] The trial court erred in granting summary judgment in favor of defendant-appellees, Acadia International Insurance Limited and Parker Hannifin Corporation, and denying plaintiff-appellants' motion for summary judgment on their claim for declaratory relief on Acadia Commercial General Liability Policy Number AGL001.
 [3.] The trial court erred in granting summary judgment in favor of defendant-appellees, Steadfast Insurance Company and Parker Hannifin Corporation, and denying plaintiff-appellants' motion for summary judgment on their claim for declaratory relief on Commercial Umbrella Liability Policy Number SUO 6987201-03.
By their assignments of error, plaintiffs challenge the trial court's grant of summary judgment to defendants. Summary judgment is governed by Civ.R. 56(C), which provides, in relevant part, as follows:
 * * * Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor. * * *
Thus, summary judgment is appropriate only where the evidence before the court demonstrates that: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence mostly strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made. Tokles 
Son, Inc. v. Midwestern Indemn. Co. (1992), 65 Ohio St.3d 621, 629, citing Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64,65-66.
In reviewing a trial court's disposition of a summary judgment motion, an appellate court applies the same standard as that applied by the trial court. Maust v. Bank One Columbus, N.A. (1992), 83 Ohio App.3d 103, 107. An appellate court reviews a summary judgment disposition independently and without deference to the trial court's judgment. Brown v. Scioto Cty. Bd. of Commrs. (1993), 87 Ohio App.3d 704, 711. Thus, in determining whether a trial court properly granted a summary judgment motion, an appellate court must review the standard for granting summary judgment set forth in Civ.R. 56, as well as the applicable law.
In their first assignment of error, plaintiffs take issue with the trial court's grant of summary judgment in favor of Parker and Zurich. Plaintiffs contend that the trial court's decision finding that Parker was self-insured "in a practical sense" and therefore its policy with Zurich was not subject to the requirements of R.C. 3937.18 was improper as a matter of law. Plaintiffs further contend that the trial court erred as a matter of law in determining that Parker validly rejected UM/UIM coverage.
The Zurich policy was originally issued on April 1, 1996, for a period of one year. The policy provides liability coverage in single limits of one million dollars per accident. Parker elected to reject UM/UIM coverage in those states, such as Ohio, where it could legally do so. Through Lynn Gross, Manager of Risk and Insurance Services, Parker executed a written rejection of UM/UIM coverage on April 8, 1996. The policy was renewed for successive one year periods on April 1, 1997 and April 1, 1998. Parker purportedly rejected UM/UIM coverage in both renewals through written rejections executed by Ms. Gross on July 1, 1997 and July 7, 1998, respectively.
The April 1, 1997 and April 1, 1998 renewal policies included a "Business Auto Coverage Deductible Endorsement," which provided in pertinent part:
Coverage Deductible Amount/Basis
Liability
Damages for Bodily $1,000,000 each "accident"
Injury, Property Damage and
Covered Pollution Cost or Expense
* * *
ALLOCATED LOSS ADJUSTMENT EXPENSE ("ALAE")
Section One:
 Option 1. X As respects each "accident" or each "loss" (as applicable), all "ALAE" is reimbursed in addition to the Deductible Amount.
* * *
A. How This (These) Deductible(s) Apply(ies):
 You agree to reimburse us for each "accident" or each "loss" up to the Deductible Amount shown in the Schedule above:
1. All sums payable for other than "ALAE"; plus
 2. All "allocated loss adjustment expense" as respects any "accident" or "loss":
 a. When you have elected Option 1 in the Schedule above, in addition to and not limited by the deductible amount[.]
In addition, the record contains the affidavit of Ms. Gross, who attested that Parker had functioned as a self-insurer for the past twelve years, employed its own claims adjustment coordinator, made all decisions regarding claims handling, adjustment, settlement or trial, engaged counsel, and did not consider itself an insured of Zurich, other than "in form only" to facilitate its business. She further attested that Zurich had no right to handle or manage claims or select counsel, did not charge Parker a "premium" for its services, rather, it charged an "administrative fee" based upon administrative costs and not upon risk and claims history, and maintained no risk. She further stated that Parker and Zurich were parties to a "Claims Services Contract," under which Parker determined whether a claim was complex enough to be sent to Zurich for claims investigation and handling or should remain with its in-house claims adjustment coordinator.
Attached to Ms. Gross's affidavit is a copy of the "Claims Services Contract" referenced above, which is an agreement between Parker and third-party administrator Zurich Services Corporation ("ZSC"). Under that contract, ZSC agreed to provide claim services (including review, investigation, adjustment, settlement, defense, retention of counsel and payment of all allowed loss adjustment expense ["ALAE"]) for all qualified claims reported to ZSC during the stated term of the agreement, provided the claims fell within the coverage of one of the "policies of insurance" issued to Parker. One of the "policies of insurance" listed is the policy at issue herein.
Further, under the contract, Parker granted "full and complete" authority to ZSC for all matters pertaining to the handling of claims within the subject of the contract. The contract further established a "Loss Fund Account," which enabled ZSC to fund for claim or loss payments and ALAE payments made on behalf of Parker. The Loss Fund Account was established by ZSC, in its name, with funds made available by Parker through Zurich for deposit in the Loss Fund Account. Under the contract, ZSC and Parker acknowledged that claim or loss payments, including ALAE payments, would be made exclusively with funds from the Loss Fund Account. The contract further stated that ZSC could suspend claims handling and payments in the event Parker failed to cooperate with Zurich regarding the Loss Fund Account or was the subject of any voluntary or involuntary insolvency proceeding.
Also attached to Ms. Gross's affidavit is a copy of the "Deductible Agreement" between Parker and Zurich. That agreement provided that ZSC was to handle and pay claims presented in accordance with the provisions of the policy and that Parker would be billed for claim payments within the deductible amount, plus related expenses and assessments as stated in the specifications. The agreement further provided that Zurich accepted the risk transfer excess of the deductible amount up to the limits of liability under the policy and that Parker would pay Zurich for their assumption of that obligation and any expenses.
The specifications include the business automobile liability policy at issue as one of the applicable policies. In addition, the specifications state:
Deductible Amount(s)
 The following are the Deductible Amount(s) applying to all losses, claims, suits, actions or other proceedings with respect to all coverages provided under the Policy(ies):
 A. The first $1,000,000 * * * of the coverages provided under the Automobile Liability * * * Policy(ies).
B. ALAE will be handled and paid as follows:
 ALAE is in addition to the limits of liability and is reimbursed to [Zurich] by [Parker].
* * *
 J. The limits of liability under the Policy(ies) shall be reduced by the application of the Deductible Amount(s).
Because there have been numerous changes in recent years in both statutory and case law regarding UM/UIM coverage, we must initially determine the applicable policy period and the applicable version of R.C. 3937.18.
In Wolfe v. Wolfe (2000), 88 Ohio St.3d 246, the Ohio Supreme Court held that "[p]ursuant to R.C. 3937.31(A), each motor vehicle liability insurance policy issued in this state must have, at a minimum, a guaranteed two-year policy period during which the policy cannot be altered except by agreement of the parties and in accordance with R.C.3937.30 to 3937.39." Id. at paragraph one of the syllabus. The court further held that "[t]he commencement of each policy period mandated by R.C. 3937.31(A) brings into existence a new contract of automobile insurance, whether the policy is categorized as a new policy of insurance or a renewal of an existing policy." Id. at paragraph two of the syllabus. Accordingly, in order to determine the effective date of the new contract, a court must determine the original issuance date of the policy and count successive two-year policy periods from that date. Id. at 250.
Here, the original issuance date of the Zurich policy was April 1, 1996. Counting successive two-year policy periods from that date, the last two-year guaranteed policy period before the September 3, 1998 accident began to run on April 1, 1998. "For the purpose of determining the scope of coverage of an underinsured motorist claim, the statutory law in effect at the time of entering into a contract for automobile liability insurance controls the rights and duties of the contracting parties." Ross v. Farmers Ins. Group of Cos. (1998), 82 Ohio St.3d 281, syllabus. Pursuant to Ross, we must apply the version of R.C. 3937.18 in effect on April 1, 1998.[3]
That version of R.C. 3937.18 provided, in pertinent part, that "[n]o automobile liability or motor vehicle liability policy of insurance * * * shall be delivered or issued for delivery in this state * * * unless both [UM and UIM] coverages are offered to persons insured under the policy * * *." R.C. 3937.18(A)(1). Further, R.C. 3937.18(A)(1) and (2) provided, in part, that the UM/UIM coverages must be "in an amount of coverage equivalent to the automobile liability or motor vehicle liability coverage * * *." Failure to offer UM/UIM coverage resulted in the automatic extension of that coverage by operation of law. See Abate v. Pioneer Mutual Cas. Co. (1970), 22 Ohio St.2d 161, paragraph two of the syllabus.
As noted previously, plaintiffs first contend that the trial court erred in determining that Parker is self-insured and that its policy with Zurich is not subject to the requirements of R.C. 3937.18. The starting point for our analysis of this issue is Snyder v. Roadway Express, Inc. (1982), 7 Ohio App.3d 218. In that case, Snyder, an employee of Roadway Express ("Roadway"), sustained personal injuries in a collision with an uninsured motorist. The parties conceded that Roadway held a certificate of self-insurance with regard to motor vehicle liability insurance. Snyder requested coverage from Roadway as to UM coverage and was informed that it had none. Thereafter, Snyder filed an action seeking a declaratory judgment requiring Roadway, as a self-insurer, to provide UM coverage. The Summit County Court of Appeals held that the UM/UIM requirements of R.C. 3937.18 were not intended to apply to self-insurers. Id. In so holding, the court determined that the statute applied to insurance carriers authorized to write motor vehicle liability insurance policies and did not mention self-insurers. The court explained that if the statute was applied to self-insurers, it would result in the "anomalous situation where one has the right to reject an offer of insurance to ones' self." Id. The court stated that it "did not believe the legislature intended such an absurd result." Id.
Four years later, the Ohio Supreme Court decided Grange Mut. Cas. Co. v. Refiners Transport and Terminal Corp. (1986), 21 Ohio St.3d 47. In Grange, a truck driver employed by Refiners was fatally injured by an uninsured motorist. The accident occurred while the decedent was driving a truck, owned by Refiners, in the course of his employment. Refiners met state financial responsibility requirements for its truck fleet in part by purchasing a financial responsibility bond and in part by purchasing excess insurance coverage, none of which contained uninsured motorists coverage. The decedent's personal motor vehicle policy, issued by Grange, contained uninsured motorist coverage. After Grange settled with the decedent's estate, it filed a declaratory judgment action against Refiners alleging that Refiners was required to provide uninsured motorist coverage on its truck fleet. Grange asserted that Refiners, as a self-insurer, was obligated under R.C. 3937.18 to provide uninsured motorist coverage for the protection of its drivers. In opposition, Refiners contended that it was not a self-insurer, and in any event, Ohio law did not require that uninsured motorist coverage be provided either under a financial responsibility bond or by a self-insurer.
The court framed the issue before it as "whether an employer, who meets Ohio's financial responsibility laws other than by purchasing a contract of liability insurance, must comply with the requirements concerning uninsured motorist coverage contained in R.C. 3937.18 relative to employees injured in the course of employment while driving or occupying a vehicle owned by the employer." Id. at 48. The court adopted the result reached in Snyder, supra, i.e., that R.C. 3937.18 did not apply to self-insurers. The Grange court found that although Refiners' effort to meet its financial responsibility requirements by purchasing a financial surety bond and two excess insurance policies did not make it a self-insurer "in the legal sense contemplated by R.C. 4509.45(D) and4509.72," such effort did make it a self-insurer "in the practical sense in that Refiners was ultimately responsible under the term of its bond either to a claimant or the bonding company in the event the bond company paid any judgment claim." Id. at 49. The court further noted that "[s]ince we find that [Refiners'] status was actually that of a bond principal and not a self-insurer, a conclusion that the requirements of R.C. 3937.18 are not applicable is even more compelling." Id. The court ultimately found, however, that "whether [Refiners] is considered a bond principal, self-insurer, or both," Refiners was not subject to the requirements of R.C. 3937.18. Id. at 50. Despite its narrow framing of the issue before it, the court held broadly at the syllabus that the "[u]ninsured motorists provisions of R.C. 3937.18 do not apply to either self-insurers or financial responsibility bond principals."
In McCollum v. Continental Ins. Co. (1993), Lucas App. No. L-92-141, McCollum was fatally injured in a collision with an uninsured motorist while operating a truck owned by his employer, an RLC Corporation ("RLC") Ohio subsidiary. The executor of McCollum's estate instituted a declaratory judgment action to determine the rights and obligations of the parties under a comprehensive liability policy issued to RLC by Continental Insurance Company ("Continental"). Under the terms of the policy, Continental agreed to indemnify RLC for the "net ultimate loss" (in excess of a self-retained limit of two hundred fifty thousand dollars) for which RLC became legally obligated as the result of a claim for, inter alia, bodily injury. The total limit of liability stated in the policy was seven hundred fifty thousand dollars in excess of RLC's two hundred fifty thousand dollar self-retained limit. The policy contained no endorsements relative to uninsured motorist coverage.
It was undisputed that RLC never filed a certificate of self-insurance due to a "fronting agreement" between RLC and Continental. The court described the "fronting agreement" as follows:
 [A] "fronting agreement" * * * is an insurance term indicating that an entity is renting an insurance company's licensing and filing capabilities in a particular state or states. Pursuant to the RLC/Continental fronting agreement, RLC paid yearly premiums to Continental which, in turn, filed the proof of insurance required by Ohio's governmental agencies, e.g., the Public Utilities Commission of Ohio. The insurer named in these filings was Continental; they provided liability coverage on a first dollar basis. That is, Continental filed proof that RLC was insured by Continental up to its $250,000 self-retained limit. In the event that Continental was required to satisfy a claim as a result of the filings, RLC, pursuant to an indemnity agreement, automatically reimbursed Continental in an amount up to the self-retained limit of $250,000. [Id.]
Continental contended that pursuant to this "fronting agreement," RLC was a self-insurer and, therefore, R.C. 3937.18 was inapplicable to the Continental policy. The McCullom court, citing Grange, supra, found as follows:
 Although the Grange court ultimately decided that Refiners was a bond principal rather than a self-insurer, the precepts provided in that case serve as guidelines in this cause. Here, RLC entered into a fronting agreement with Continental under which the latter made required filings representing that it was the liability insurer for RLC in Ohio for every dollar of the self-retained limit of $250,000. If a claim arose, Continental was required to pay on behalf of RLC as a result of the agreement and was automatically reimbursed by RLC. Therefore, there was no shift of risk of loss from RLC to Continental and, as in Grange, RLC was ultimately responsible for any claim. Accordingly, one could conclude that RLC was self-insured "in a practical sense." * * * [Id.]
The McCollum court ultimately concluded, however, that despite the fact that RLC was, for all practical purposes, a self-insurer, R.C. 3927.18(A) was applicable to excess fleet liability policies carried by a self-insurer. As a result, the court concluded that RLC's status as a self-insurer did not affect the applicability of R.C. 3937.18 to the policy.
In July 2000, the United States District Court for the Southern District of Ohio decided Lafferty v. Reliance Ins. Co. (S.D.Ohio 2000),109 F. Supp.2d 837. In that case, Lafferty, an employee of Consolidated Rail Corporation ("ConRail") was driving a truck owned by ConRail when he was struck by a truck owned by Mutter's Lawn Service ("Mutter's") and operated by one of its employees. Lafferty asserted claims against Mutter's and the employee, and their insurers paid their combined policy limits of $1.5 million. Thereafter, Lafferty filed a claim action against ConRail's insurer, Reliance Insurance Company ("Reliance"), asserting that the Reliance policy should have included $5 million in UIM coverage which should be available to Lafferty to cover the remainder of his claims. ConRail argued that the policy was not true insurance, but as a "fronting policy," was self-insurance not subject to R.C. 3937.18.
The court described the insurance arrangement between ConRail and Reliance in this way:
 * * * ConRail requested a quote [from Reliance] on a "fronting" policy with liability limits of five million dollars and a matching deductible of five million dollars. In effect, ConRail was asking Reliance to make all filings necessary to satisfy the motor vehicle financial responsibility laws of all fifty states, and to provide claims administration services while ConRail retained the risk of loss due to liability. Realizing that most states have statutory requirements relating to * * * ("UM/UIM") coverage, ConRail requested that in the proposed insurance plan such coverage should be eliminated in states where it is permissible to reject it, and that it should be written with the minimum limits permitted by statute in states where rejection is not permitted. [Id. at 838.]
The court further stated:
 The ConRail policy had a matching liability limit and deductible amount of five million dollars. ConRail was obligated to promptly reimburse Reliance for the entire amount of any payments made under the policy, and ConRail's obligation to do so was secured by a letter of credit. In effect, ConRail was a self-insurer and Reliance was providing a service which included the defense and adjustment of claims and the use of its licenses as an insurer so that ConRail could satisfy the automobile insurance requirements of the various states in which it operated motor vehicles. [Id. at 841.]
The Lafferty court discussed and quoted from Grange and noted that "[t]wo Ohio courts have applied the rationale of [Grange] to matching deductible policies similar or identical to the one involved in this case." Id. at 842 (citing McCollum, supra, and DeWalt v. State Farm Ins. Co. [1997], Lake C.P. No. 96CV001173.) The DeWalt case was attached to Lafferty as an appendix since it involved the same parties and the same insurance policy.
In DeWalt, the court found that because ConRail had agreed to assume the risk of loss up to the policy limits, it was self-insured in a practical sense although not statutorily self-insured in accordance with R.C. Chapter 4509. In so finding, the court noted that "the policy did not shift the risk of loss to the insurer and indeed, the policy required Conrail to even assume certain administrative costs of Reliance in processing the claims." Id. The court further noted that although there was no case law on the issue of whether entities "effectively self-insured" were required to comply with R.C. 3937.18, there was case law holding that entities who had filed certificates of self-insurance (Snyder) and entities who had posted financial responsibility bonds (Grange) were not required to comply with R.C. 3937.18. The court extended the logic in those two cases "one step further" to conclude that "a self-insurer in a practical sense is not required to comply with R.C.3937.18." Id.
The Lafferty court adopted the reasoning in DeWalt and concluded that "under the matching deductible policy issued by Reliance, ConRail was a self-insurer in the practical sense and * * * the Reliance policy was not subject to the provisions of O.R.C. 3937.18." Id.
In determining whether an entity is self-insured, courts look at who bears the risk of loss. "Self-insurance is not insurance; it is the antithesis of insurance." Physicians Ins. Co. of Ohio v. Grandview Hosp. Med. Ctr. (1988), 44 Ohio App.3d 157, 158. This notion was reiterated in Jennings v. Dayton (1996), 114 Ohio App.3d 144, wherein the Montgomery County Court of Appeals stated:
 [W]hile insurance shifts the risk of loss from the insured to the insurer, self-insurance involves no risk-shifting. Rather, in the self-insurance context, the risk is borne by the one whom the law imposes it. The defining characteristic of insurance, the assumption of specific risks from customers in consideration for payment, is entirely absent where an entity self-insures. * * * [Id. at 148.]
The Jennings court held, therefore, that "self-insurance" is the legal equivalent of no insurance for purposes of the distribution of UM/UIM benefits in accordance with R.C. 3937.18(A).
R.C. 4509.45(E) and 4509.72 set forth the specific requirements for being a self-insurer in the motor vehicle context. R.C. 4509.45(E) provides that proof of financial responsibility may be given by filing:
 A certificate of self-insurance, as provided in section 4509.72 of the Revised Code, supplemented by an agreement by the self-insurer that, with respect to accidents occurring while the certificate is in force, he will pay the same amounts that an insurer would have been obligated to pay under an owner's motor vehicle policy if it had issued such a policy to the self-insurer.
R.C. 4509.72 states, in pertinent part:
 (A) Any person in whose name more than twenty-five motor vehicles are registered in this state may qualify as a self-insurer by obtaining a certificate of self-insurance issued by the registrar of motor vehicles as provided in division (B) of this section.
 (B) The registrar shall issue a certificate of self-insurance upon the application of any such person who is of sufficient financial ability to pay judgments against him.
 A certificate may be issued authorizing a person to act as a self-insurer for either property damage or bodily injury liability, or both.
Parker and Zurich concede that Parker does not hold a certificate of self-insurance pursuant to R.C. 4509.72 and 4509.45(E), nor is it a surety bond principal pursuant to R.C 4509.45(C). However, in the trial court, Parker and Zurich relied upon Lafferty, McCollum and DeWalt in arguing that the matching deductible language contained in the Zurich policy makes Parker, in a practical sense, a self-insurer; thus, the policy is not subject to the requirements of former R.C. 3937.18(A). The trial court agreed. We do not agree with the position taken by Parker, Zurich and the trial court, however, as we are neither compelled, nor inclined, to follow Lafferty, McCullom or DeWalt. None of the three cases are controlling authority on this court. See Kelly v. Ford Motor Co. (1957), 104 Ohio App. 185, 194 (federal decisions not binding upon state appellate courts); Evans v. Wills (2001), Franklin App. No. 01AP-422 (unreported cases from other appellate districts not controlling authority); Rumberg v. Rumberg (1998), Mahoning App. No. 96CA156 (appellate court not bound by common pleas court decisions). Further, we do not find any of the three cases to be persuasive authority, as they all, in our view, extend Grange well beyond its holding.
Initially, we note that Grange is factually distinguishable from Lafferty, McCullom, DeWalt and the instant case. In Grange, Refiners purchased a financial responsibility bond and two excess insurance policies. The court adopted the conclusion reached in Snyder, which held that former R.C. 3937.18 did not apply to self-insurers. The Snyder case involved an employer who was qualified as a self-insurer pursuant to its filing of a certificate of self-insurance. The Grange court ultimately determined that Refiners' status as a bond principal made it a self-insurer "in a practical sense," even though Refiners had not obtained a certificate of self-insurance. The court recognized that proof of financial responsibility may be satisfied by filing a surety bond without having to obtain a certificate of self-insurance.
In contrast, Lafferty, McCullom, DeWalt and the instant case do not involve either bond principals or certificated self-insurers; rather, they involve entities who entered into "fronting/matching deductible agreements" with insurance companies in an apparent effort to avoid meeting the statutory requirements to qualify as a self-insurer. The issue of whether "fronting/matching deductible agreements" constitute self-insurance was not addressed, or even contemplated, in Grange. Thus, we find it improper to extend Grange to include as self-insurers entities who enter into "fronting/matching deductible agreements."
Further, we do not believe that the "fronting/matching deductible agreement" between Parker and Zurich constitutes a self-insured scheme. We reiterate that Parker admits that it did not file a certificate of self-insurance in accordance with R.C. 4509.45(E) and 4509.72. Despite its admitted failure to comply with the statutory requirements for invoking self-insured status, Parker seeks to declare itself a self-insurer for purposes of avoiding the requirements of the UM/UIM statute. It is our view that Parker cannot have it both ways.
Upon review of the policy language, including that contained in the "Claims Services Contract" and the "Deductible Agreement," we conclude that the agreement between Zurich and Parker constitutes an insurance policy. Both the "Claims Services Contract" and the "Deductible Agreement" refer to the policy as a "policy of insurance." Moreover, when a liability claim arises against Parker, Zurich is required to pay the entire loss and is then reimbursed by Parker. However, the ultimate risk for the loss remains with Zurich, if Parker either refuses or is financially unable to reimburse Zurich for the loss. We do not believe that this type of reimbursement arrangement is enough to make Parker "self-insured in the practical sense." Because Parker neither obtained a certificate of self-insurance certifying that it is of sufficient financial ability to pay judgments against it (as contemplated in Snyder), nor posted a financial responsibility bond (as contemplated in Grange), Parker may not be considered a self-insurer. As stated by the Montgomery County Court of Common Pleas in Roberts v. State Farm Mutual Auto. Ins. Co. (2001), Montgomery C.P. No. 00-CV-0886:
 It may be well and good and entirely lawful for a "fronting agreement" * * * to spare [an entity] the expense and potential administrative quagmires of formal registration in every state, territory and country where it does business and for these "devices" to provide [an entity] the use of [an insurer's] filings and claims service, but they do not paralyze or mute the walking and quacking duck of insurance coverage.
Although we are clearly not bound by this decision, we find the court's reasoning persuasive and applicable to the case before us.
Accordingly, we conclude the trial court erred as a matter of law in finding that Parker was self-insured and that its policy with Zurich was not subject to the requirements of R.C. 3937.18. Since Parker attempted to satisfy R.C. 4509.45 via its automobile liability policy with Zurich, Zurich was required to offer UM/UIM coverage.
Our analysis does not end here, however, because the trial court found that even if Zurich was not self-insured and was thus required to offer UM/UIM coverage, Parker validly rejected such coverage. We disagree.
The version of R.C. 3937.18(C) applicable to the instant case provided in part:
 A named insured or applicant may reject or accept both coverages as offered under division (A) of this section, or may alternatively select both such coverages in accordance with a schedule of limits approved by the superintendent. * * * A named insured's or applicant's rejection of both coverages as offered under division (A) of this section * * * shall be in writing and shall be signed by the named insured or applicant. A named insured's or applicant's written, signed rejection of both coverages as offered under division (A) of this section * * * shall be effective on the day signed, shall create a presumption of an offer of coverages consistent with division (A) of this section, and shall be binding on all other named insureds, or applicants.
As previously noted, the record in the instant case includes a signed copy of an "Uninsured/Underinsured Motorists Coverage Selection/Rejection/Limits Summary Form," which summarized Parker's selection/rejection of UM/UIM in all fifty states. This "Summary Form" expressly indicated that an "Uninsured/Underinsured Motorists Coverage Selection/Rejection and Limits Options" form accompanied the policy. The "Summary Form" further stated that by signing it, the insured indicated that it had read and understood the "Uninsured/Underinsured Motorists Coverage Selection/Rejection and Limit Option" form. It further stated in capital letters that "This summary is not a substitute for reviewing each individual state's selection/rejection form for UM and UIM coverage. You are required to do so."
The record also includes a signed copy of the "Rejection of Uninsured/Underinsured Motorists Coverage, Selection of Lower Limit of Liability Rejection of Uninsured Motorists Property Damage Coverage" form for Ohio ("Ohio form"). That form states, in pertinent part, as follows:
 The Ohio Revised Code (Section 3937.18), amended, permits you the insured named in the policy, to reject the Uninsured Motorists/Underinsured Motorists Coverage or to select a limit for such coverage lower than the limit for Bodily Injury Coverage in the policy. Uninsured Motorists Coverage provides insurance for the protection of persons insured under the policy who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death resulting therefrom. Underinsured Motorists Coverage provides insurance for protection against loss for bodily injury, sickness or disease, including death, where the limit of coverage available for payment to the insured is less than the limit for the Uninsured Motorists Coverage under all bodily injury liability bonds and insurance policies covering persons liable to the insured under your policy at the time of the accident.
* * *
 In accordance with the Ohio Revised Code (Section 3937.18), amended, and Ohio Code (Section 3937.181), the undersigned insured (and each of them) —
* * *
 X_ agrees that the Uninsured Motorists/Underinsured Motorists Coverage afforded in the policy is hereby deleted.
In the trial court, Zurich and Parker contended that the written rejection of UM/UIM coverage created a presumption under R.C. 3937.18(C) that UM/UIM coverage was offered consistent with the requirements of R.C. 3937.18(A). Plaintiffs admitted that the presumption existed; however, they argued that the applicable version of R.C. 3937.18(C) did not eliminate the requirement that the offer comport with the requirements set forth in Linko v. Indemn. Ins. Co. of N. Am. (2000),90 Ohio St.3d 445. Plaintiffs further contended that Parker's rejection was ineffective under Linko because Zurich's offer did not expressly state the premium for UM/UIM coverage and UM/UIM coverage limits.
The trial court determined that Linko was inapplicable to the instant case because Linko was concerned with a prior version of R.C. 3937.18
that did not include the language about the presumption that the offer was made. The trial court found that plaintiffs had failed to rebut the presumption that a legally sufficient offer was made and thus held that there was a sufficient offer and rejection of UM/UIM coverage equal to the liability coverage of the Zurich policy.
In Gyori v. Johnston Coca-Cola Bottling Group, Inc. (1996),76 Ohio St.3d 565, the Ohio Supreme Court held at paragraph one of the syllabus that "[t]here can be no rejection pursuant to R.C. 3937.18(C) absent a written offer of uninsured motorist coverage from the insurance provider." In Linko, supra, the Ohio Supreme Court discussed Gyori, stating:
 * * * Gyori stands for the proposition that we cannot know whether an insured has made an express, knowing rejection of UIM coverage unless there is a written offer and written rejection. It only follows that a valid rejection requires a meaningful offer, i.e., an offer that is an offer in substance and not just in name." [Id. at 449.]
In the instant case, Parker and Zurich do not contend that Zurich's offer contained premium information and/or coverage limits. Instead, Parker and Zurich maintain that Linko's requirement that the offer include premium information and/or coverage limits is no longer viable in light of the amended version of R.C. 3937.18(C). They contend that when the General Assembly enacted the amendments to R.C. 3937.18(C), it rejected the Gyori requirement that an offer must be in writing and, accordingly, since that requirement was a central premise of the court's holding in Linko, the requirements set forth in Linko as to what constitutes a meaningful offer are no longer good law.
The precise issue raised herein was recently considered by this court in Edstrom v. Universal Underwriters Ins. Co., Franklin App. No. 01AP-1009, 2002-Ohio-3334, at ¶ 18, wherein we held that "[t]he presumption and the amendments do not eliminate the requirements in Linko that there be a meaningful offer, one that is an offer in substance and not just name." This court noted that in Linko, the Ohio Supreme Court applied basic contract law to determine what constituted a valid offer of UM/UIM coverage and concluded that an offer must contain "a brief description of the coverage, the premium for that coverage, and an express statement of the UM/UIM coverage limits." Linko, at 449. This court further noted that the same result had been reached by the Fifth District Court of Appeals in Pillo v. Stricklin (2001), Stark App. No. 2001CA00204, which held that the 1997 amendments to R.C. 3937.18 did not eliminate the requirements set forth in Linko as to what an offer must contain and that there were no provisions in H.B. 261 which clarified or modified what the contents of a written offer must be. Accord, Still v. Indiana Ins. Co. (2002), Stark App. No. 2001 CA 00300; Roper v. State Auto. Mut. Ins. Co., Hamilton App. No. C-010117, 2002-Ohio-3282 at ¶ 29 ; Raymond v. Sentry Ins. (2002), Lucas App. No. L-01-1357; Shindollar v. Erie Ins. Co., Auglaize App. No. 2-01-35, 2002-Ohio-2971 at ¶ 9; Minor v. Nichols, Jackson App. No. 01CA14, 2002-Ohio-3310 at ¶ 15. But, see Martinez v. Travelers Ins. Co. (2002), Summit App. No. 20796 (not applying Gyori or Linko to an action arising out of the 1997 amendments to R.C. 3937.18); Purvis v. Cincinnati Ins. Co. (2002), Greene App. No. 2001CA104 (rejecting Linko when concluding that a valid rejection may be rebutted).
In the instant case, the "Summary Form" clearly and unambiguously indicated that the Ohio form is the offer and the "Summary Form" is the rejection form. Minor, supra. Parker and Zurich do not dispute, and a review of the record establishes, that the offer did not contain UM/UIM premium information and/or coverage limits. Thus, the purported rejection of UM/UIM coverage was invalid because the offer was legally inadequate. Without a meaningful offer, there can be no valid rejection. See Edstrom, supra. Accordingly, UIM coverage arises by operation of law in an amount equal to the policy liability coverage. Abate, supra. Based on the foregoing, plaintiffs' first assignment of error is well-taken.
By the second assignment of error, plaintiffs contend that the trial court erred in granting summary judgment to Parker and Acadia on plaintiffs' claim for declaratory relief under the commercial general liability policy issued by Acadia. Specifically, plaintiffs contend that the Acadia policy is a motor vehicle liability policy subject to the requirements of R.C. 3937.18 and, as such, Acadia was required to offer UM/UIM coverage. Plaintiffs contend that since it is undisputed that no such coverage was offered by Acadia (and therefore, there was no valid rejection of such coverage by Parker), UM/UIM coverage in an amount equal to the liability coverage set forth in the declarations page of the policy was provided by operation of law.
The Acadia policy was originally issued on April 1, 1995, for a period of one year. The policy provided bodily injury liability coverage of two million dollars per accident. The declarations page of the policy did not state that the policy provided UM/UIM coverage, nor did Acadia expressly offer it. The policy was thereafter renewed, with the applicable policy period commencing on April 1, 1998. The original policy and the applicable renewal contained a "Self-Insured Deductible" endorsement, which stated: "[n]otwithstanding anything contained herein to the contrary the insurer will not pay the first $2,000,000 arising out of each occurrence." The trial court found that the "Self-Insured Deductible" endorsement constituted a "matching deductible/deductible equal limits" devise similar to that in Parker's commercial automobile liability policy with Zurich; thus, because Parker was self-insured, Acadia was not required to offer UM/UIM coverage. Having so found, the trial court declined to determine whether the Acadia policy was a motor vehicle liability policy of insurance subject to the requirements of R.C. 3937.18, or whether Ms. Dalton fell within the definition of a "named insured" under the policy.
However, for the reasons set forth in our discussion regarding the Zurich policy, we find that Parker is not, as a matter of law, self-insured. Accordingly, we find that the trial court erred in finding that Parker was self-insured and that the Acadia policy was thus not subject to the requirements of former R.C. 3937.18. Accordingly, the matter must be remanded to the trial court for a determination as to whether the Acadia policy constitutes a motor vehicle policy of insurance subject to the requirements of former R.C. 3937.18 and, if so, whether Ms. Dalton qualifies as a "named insured" under the policy. Accordingly, the second assignment of error is well-taken.
By the third assignment of error, plaintiffs contend that the trial court erred in granting summary judgment to Parker and Steadfast on plaintiffs' claim for declaratory relief under the commercial umbrella liability policy issued by Steadfast. Specifically, plaintiffs contend that the Steadfast policy is subject to the requirements of R.C. 3937.18, and, since it is undisputed that no UM/UIM coverage was offered by Steadfast (and therefore, there was no valid rejection of such coverage by Parker), UM/UIM coverage in an amount equal to the liability coverage set forth in the declarations page of the policy was provided by operation of law.
The Steadfast policy was issued for a three-year period commencing on April 1, 1997, and provided liability limits of twenty-five million dollars per occurrence. The declarations page of the policy did not state that the policy provided UM/UIM coverage, nor did Steadfast expressly offer it. The policy provided that Steadfast "will pay on behalf of the insured that portion of the ultimate net loss in excess of the retained limits * * * which the insured shall become legally obligated to pay as damages because of bodily injury * * * caused by an occurrence to which this insurance applies." The policy defined "retained limit" in pertinent part, as "the total of the applicable limits of the underlying insurance listed in the Schedule of Underlying Insurance, whether or not collectible, and the applicable limits of any other underlying insurance providing coverage to the insured[.]" Further, the policy contained a "Schedule of Underlying Insurance" endorsement, which listed the Zurich automobile liability policy.
The trial court found that the Steadfast policy was invoked only after Parker sustained liability covered by the Zurich automobile policy, Zurich paid the full limits of its policy, and Parker had remaining liability. According to the trial court, because the Zurich policy did not provide UM/UIM coverage, there was no excess coverage for Steadfast to pay. Having determined, however, that the trial court erred as a matter of law in finding that the Zurich policy did not provide UM/UIM coverage, the matter must be remanded to the trial court for a determination as to whether the Steadfast policy provides UM/UIM coverage by operation of law. Accordingly, the third assignment of error is well-taken.
For the foregoing reasons, all three of plaintiffs' assignments of error are sustained, the judgment of the Franklin County Court of Common Pleas is reversed, and this cause is remanded to that court for further proceedings in accordance with law and consistent with this opinion.
Judgment reversed and cause remanded.
BOWMAN and BROWN, JJ., concur.
[1] Mr. Dalton's claim was for loss of consortium.
[2] Where appropriate, defendants Parker, Zurich, Acadia and Steadfast will be collectively referred to as "defendants."
[3] The applicable version of R.C. 3937.18 was effective September 3, 1997. R.C. 3937.18 has since been amended by S.B. 97, effective October 31, 2001, to "[e]liminate any requirement of the mandatory offer of uninsured motorist coverage, underinsured motorist coverage, or both uninsured and underinsured motorist coverages"; to "[e]liminate the possibility of uninsured motorist coverage, underinsured motorist coverage, or both uninsured and underinsured motorist coverages being implied as a matter of law in any insurance policy;" to "[e]liminate any requirement of a written offer, selection, or rejection form for uninsured motorist coverage, underinsured motorist coverage, or both uninsured and underinsured motorist coverages from any transaction in an insurance policy."